McGREGOR W. SCOTT
United States Attorney
KEVIN C. KHASIGIAN
Assistant U. S. Attorney
501 I Street, Suite 10-100
Sacramento, CA  95814
Telephone: (916) 554-2700

Attorneys for the United States

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>APPROXIMATELY $2,676,000.00 IN U.S. CURRENCY,<br><br>APPROXIMATELY $5,857.00 IN U.S. CURRENCY, and<br><br>REAL PROPERTY LOCATED AT 1111 21ST STREET, BAKERSFIELD, CALIFORNIA, KERN COUNTY, APN: 005-262-01, INCLUDING ALL APPURTENANCES AND IMPROVEMENTS THERETO,<br><br>　　　　　　Defendants. | VERIFIED COMPLAINT FOR FORFEITURE *IN REM* |

The United States of America, by and through its undersigned attorney, brings this complaint and alleges as follows in accordance with Supplemental Rule G(2) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions:

**NATURE OF ACTION**

1.  This is a civil action *in rem* to forfeit Approximately $2,676,000.00 in U.S. Currency, Approximately $5,857.00 in U.S. Currency, and Real Property Located at 1111 21st Street, Bakersfield, California, Kern County, APN: 005-262-01.  The defendant currency is forfeitable because it represents

illegal drug proceeds and the defendant property is forfeitable because it facilitated illegal drug transactions, pursuant to 21 U.S.C. §§ 881(a)(6) and (a)(7).

2. The defendant approximately $2,676,000.00 in U.S. Currency was seized on June 26, 2013 during the search of Kamar's residence located on Connery Way, in Bakersfield, California. The defendant currency is currently in the custody of the U.S. Marshals Service, Eastern District of California.

3. The defendant approximately $5,857.00 in U.S. Currency was seized during a federal search of 3221 Niles Street, in Bakersfield, California on June 26, 2013, and is in the custody of the U.S. Marshals Service, Eastern District of California.

4. The defendant warehouse is described as real property located at 1111 21st Street, Bakersfield, California, Kern County, APN: 005-262-01, and more fully described below:

> The land referred to herein below is situated in the City of Bakersfield, County of Kern, State of California, and is described as follows:
>
> Lots 1, 2, 3, and 4 in Block 209 of Baker Homestead Tract, in the City of Bakersfield, County of Kern, State of California, as map recorded April 3, 1889 Book 1, Page 29 of Maps, in the office of the County Recorder of said County.

The recorded owner of the defendant warehouse is G.I.J. Investement Group, Inc., a California Corporation, with Mikhael Issa Kamar as the sole officer of the corporation, with Michelle Angeline Alsalti as the registered agent to act for G.I.J. Investement Group, Inc.

**JURISDICTION AND VENUE**

5. This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, over an action for forfeiture under 28 U.S.C. § 1355(a), and over this particular action under 21 U.S.C. § 881.

6. This district is a proper venue pursuant to 28 U.S.C. § 1355 because the acts giving rise to this *in rem* forfeiture action occurred in this district, and pursuant to 28 U.S.C. § 1395 because the defendant currency was seized in this district.

**OVERVIEW OF SMOKEABLE SYNTHETIC CANNABINOIDS**

7. Smokeable synthetic cannabinoid products consist of the raw synthetic cannabinoids, which are powders chemically similar to THC (tetrahydrocannabinol), the psychoactive ingredient in

marijuana. These powders are dissolved in a solvent such as acetone, and then sprayed onto to plant material, and have not been approved by the Food and Drug Administration for human consumption or medical use.

8. The Drug Enforcement Administration (DEA) has identified hundreds of synthetic cannabinoid compounds. However, the original five most common of these compounds are:

   a. (l-pentyl-3-(1- naphthoyl)indole (known as JWH-018),

   b. l-butyl-3-(1-naphthoyl)indole (known as JWH-073),

   c. 1- [2-(4-morpholinyl)ethyl]-3-(l-naphthoyl)indole (known as JWH-200),

   d. 5-(1, 1- dimethylheptyl)-2-[(1R,3S)-3-hydroxycyc1ohexyl]-phenol (known as CP-47,497), and

   e. 5-(1, l-dimethyloctyl)-2-[(1 R,3S)-3-hydroxycyclohexyl]-phenol (cannabicyclohexanol; (known as CP-47,497 C8 homologue)

9. In March 2011, the DEA temporarily placed these original five compounds on Schedule I of illegal drugs under the Controlled Substances Act. In July 2012, the Synthetic Drug Abuse Prevention Act became law, formally banning synthetic compounds commonly found in smokeable synthetic cannabinoids, synthetic stimulants, and hallucinogens, by permanently placing them under Schedule I of the Controlled Substances Act.

10. In response, manufacturers and traffickers slightly varied the chemical makeup of the compounds in an attempt to circumvent these newly enacted laws. These new modified compounds, also known as "analogues," were still structurally similar to the original five compounds, and often differed in chemical composition by only a molecule. By changing that molecule, manufacturers of these products attempted to stay one step ahead of law enforcement, as the single molecule change had the effect of changing the chemical from a Schedule I controlled substance, to an analogue of a Schedule 1 controlled substance within the meaning of 21 U.S.C. § 802(32)(A).

12. In recent years individuals have begun to manufacture and traffic smokeable synthetic cannabinoid products, known on the street as: "Spice," "K.2," "Headhunter," "Diablo," "Bizarro," "Orgazmo," "Neutronium," "Posh," and "Pure."

///

13. In further attempt to disguise the true nature of these dangerous and illegal products, the smokeable synthetic cannabinoid products are often marketed as "incense" or "potpourri," bearing a label stating: "not for human consumption." Despite these pretense package labels stating "not for human consumption," the product is primarily purchased by consumers to smoke or otherwise consume the product. Users of these products have reported effects similar to marijuana, to include, but not limited to, agitation, paranoia, panic attacks, hallucinations, psychosis, suicidal thoughts, and increased heart rate and increased blood pressure. In some cases, use of these smokeable synthetic cannabinoids has led to serious psychotic hallucinations, some of which can last for days.

14. In furtherance of their attempt to obscure the true nature of these chemicals, when the producers ship these chemicals, they are often labeled "research chemicals", to avoid suspicion by law enforcement.

15. Despite being marketed as "incense" or "potpourri," these smokeable synthetic cannabinoid products are commonly sold in smoke shops, head shops, tobacco shops, gas stations, convenience stores, adult stores and over the internet-all in contrast to the traditional retail stores where common household-use incense and potpourri are sold.

16. The makers of these products differ in the amount of chemical compounds sprayed on the plant material, which can greatly affect the effects of the synthetic cannabinoid on the user. Because of this, the user of these products never knows the strength of the concentration of chemicals on the product. Manufacturers often label these products as "1x", "10x", or even "30x", which is intended to convey to the consumer that the product has been sprayed that many times over with the chemical compound.

17. Unlike THC, the use of synthetic cannabinoids are generally not detectable in drug tests. This renders the drug attractive to users whom may be subject to drug testing in the workplace or through school activities.

18. It also appears that these products may be stored in the body for long periods of time and, therefore, the long-term effects on the human body are not fully known. During the course of this investigation, there were two deaths in Indiana which investigators had linked to the use of synthetic cannabinoids.

///

19. Packages of smokeable synthetic cannabinoids and other brand names used for synthetic cannabinoids, are typically sold in 1.5 gram and 5 gram quantities, and cost approximately $10.00 to $20.00 per 1.5 grams and up to $50.00 per 5 gram quantity depending on the listed strength. This size of packaging and price makes this product significantly more expensive than actual incense or potpourri products for household use, which are widely available at many common retail stores.

20. The amount of synthetic chemical compound on the plant material can be as low as micrograms for there to be an effect on the user. As a result, manufacturers of synthetic cannabinoid products are able to produce large quantities of the finished product, from just kilogram quantities of the chemical compounds.

## FACTUAL ALLEGATIONS

21. This case involves multiple law enforcement agencies and numerous seizures of illegal cannabinoids stemming from the multi-year investigation of Michael Issa Kamar (hereafter "Kamar"). As a result of the investigation, law enforcement learned that Kamar sold illegal drugs through an internet website, www.4aceswholesale.com, as well as via traditional retail locations. Four Aces Wholesale was one of Kamar's businesses and the Four Aces website advertised, promoted and sold suspected synthetic cannabinoids, drug paraphernalia, and other products.

22. The investigation revealed that Kamar stored and maintained multi-pound quantities of smokeable synthetic cannabinoids at his warehouse located at 1111 21st Street, Bakersfield, California 93301 (the "defendant warehouse"). Kamar's Four Aces Wholesale also conducted retail business from the defendant warehouse. Further investigation identified Kamar as the president of Four Aces Wholesale Corp, with a personal address located on Connery Way in Bakersfield, California.

23. Investigation into Four Aces Wholesale revealed Kamar's ownership and involvement in other smokeable synthetic cannabinoids type businesses, namely "Sell For Less" located at 644 Belle Terrace #5, Bakersfield, California, and "Havana House" located at 3221 Niles Street, Bakersfield, California.

24. In December 2011, law enforcement executed search warrants and seized approximately 564.94 kilograms of synthetic cannabinoids from "Havana House" located at 3221 Niles Street, Bakersfield, California and "Sell For Less" located at 644 Belle Terrace #5, Bakersfield, California. Of

the entire amount seized, 466.41 kilograms tested positive for one or more controlled substances and/or analogues, including: AM-2201, JWH-122, JWH-203, JWH-210, JWH-018, and JWH-081.

25. In May 2013, law enforcement conducted a controlled undercover buy at Havana House, located at 3615 Stockdale Highway, Bakersfield, California. An agent, acting in undercover capacity (UC), asked for "Sexy Monkey" or "Scooby Snax," which are known illegal synthetic drugs. The clerk, an unknown, Middle Eastern white male, stated that he did not have any smokeable synthetic cannabinoids. The clerk instead directed the UC to an affiliated store located on Airport Drive in Bakersfield, California.

26. Further investigation identified the affiliate store as "Havana House" tobacco shop, located at 1301 Airport Drive Oildale, California. Kern County property and business records identified both businesses as owned by John Issa Kamar.

27. In May 2013, law enforcement conducted a controlled buy at "Four Aces Wholesale," located at the defendant warehouse in Bakersfield. The undercover operation involved the purchase of smokeable synthetic cannabinoids for $3,000. The $3,000 of smokeable synthetic cannabinoids consisted of 16 brands of synthetic cannabinoids and 15 drug paraphernalia items. The 16 brands of synthetic cannabinoids included 6 packets of "Maui Wowie," 4 packets of "Mad Hatter," 8 packets of "Purple Diesel," 10 packets of "Scooby Snax," 3 packets of "Eagle," 30 packets of "Gorilla Black," 20 packets of "LV," 20 packets of "Devil's Inferno," 7 packets of "YOLO-Kush," one packet of "YOLOBlueberry," 5 packets of "Supernova-3rd Gen," 2 packets of "Supernova," 10 packets of "Scooby Doo Xtreme," one packet of "Gorilla Dro," one packet of "iBLOWN-blueberry," and one packet of "iBLOWN-Strawberry."

28. The DEA Regional laboratory analyzed "YOLO-Kush," "YOLOBlueberry," "Supernova 3rd Gen," "Supernova," and "Scooby Doo Xtreme." The lab results found that "YOLO-Kush" and "YOLO-Blueberry," contained UR-144, and that "Supernova 3rd Gen" and "Scooby Doo Xtreme," contained XLR11. The lab results found that "Supernova," contained AM-2201.

29. UR-144 is a common name for l-pentyl-3-(2,2,3,3 tetramethylcyclopropoyl)indole, which was placed under Schedule I of the Controlled Substances Act on May 16, 2013.

30. XLR11, also known as 5FUR144, is a common name for [1-(5-fluoro-pentyl)-lH-indol-3-yl](2,2,3,3-tetramethylcyclopropyl)methanone, which was also placed under Schedule I of the Controlled

Substances Act on May 16, 2013.

31. AM-2201, the common name for l-(5-fluoropentyl)-3-(1-naphthoyl)indole, was placed under the Schedule I of the Controlled Substances Act on January 4, 2013.

32. The DEA's "Controlled Substance Analogues" provides that XLR11, UR-144 and AM-2201 are analogues of JWH-018, the common name for l-pentyl-3-(1-naphthoyl)indole (JWH-018).

33. JWH-018 is an original synthetic cannabinoids that was "emergency scheduled" under Schedule I in March 2011. As of May of 2013, all of the analyses on the suspected synthetic cannabinoids purchased at the defendant warehouse tested positive for properties listed under Schedule I of the Controlled Substances Act.

34. During the controlled purchase at "Four Aces Wholesale," the undercover buyer ("UB") and an employee known as "Mark" went up to the second floor to a room containing smokeable synthetic cannabinoids. Kamar's office was adjacent to this room. Kamar and the UB went inside a room to browse and purchase smokeable synthetic cannabinoids. While the pair browsed smokeable synthetic cannabinoids, the UB reported that Kamar pointed to one particular brand and said that this product is "very strong." The UB purchased ten packages of this particular smokeable synthetic cannabinoid, later identified as "Scooby Snax" and "Scooby Doo Xtreme". The laboratory analysis on "Scooby Doo Xtreme" identified that the product contains XLR11.

35. During the undercover buy, Kamar demonstrated how the UB could use a pipe to smoke synthetic cannabinoids. Kamar led the UB to a section of the defendant warehouse where different types of smoke pipes were stored. Kamar picked up a large glass smoke pipe and showed the UB how to use and assemble the pipe, explaining that "you put the 'thing' (referring to smokeable synthetic cannabinoids) into the metallic portion of the pipe, heat up the metallic portion with a 'torch' lighter, place the small glass cap on top of the metallic portion, and smoke."

36. Law enforcement has confirmed that the defendant warehouse is within one thousand feet of Downtown Elementary School located at 2021 M Street in Bakersfield, California.

///

///

///

### Execution of Federal Search Warrant at Kamar's House
### on Connery Way in Bakersfield, California

37. On June 26, 2013, law enforcement executed a federal search warrant at Kamar's residence located on Connery Way in Bakersfield, California. Law enforcement searched the residence and located a safe inside the master bedroom closet. Inside the safe, agents located an undetermined amount of cash and miscellaneous paperwork. An agent asked Kamar who had access to the safe. Kamar answered that only he and his wife had access to the safe.

38. An official count of the defendant currency located in the safe was determined to be approximately $2,676,000.00 in U.S. Currency. All of the cash was denominated in $100 bills.

39. In the master bedroom closet, law enforcement also found approximately 55.5 grams of marijuana, miscellaneous tax documents, and miscellaneous paperwork.

40. Following advisement and waiver of his Miranda rights, Kamar confirmed ownership of the defendant warehouse located at 1111 21st Street, Bakersfield, California.

41. Kamar stated that he is not a manufacturer and *merely* buys and distributes smokeable synthetic cannabinoids from a female named Samia Armani, whom Kamar described as an Afghani from the Los Angeles, California area. Kamar stated that Samia Armani approached Kamar at the defendant warehouse and offered to sell Kamar smokeable synthetic cannabinoids. Kamar stated that he purchased about $2,000 worth of smokeable synthetic cannabinoids from Samia Armani every six months. Kamar stated that he only purchased smokeable synthetic cannabinoids from Samia Armani but that in 2011, he bought smokeable synthetic cannabinoids from an individual who goes by the name of "Spice King" in the Anaheim, California area. Kamar stated that the laboratory reports on smokeable synthetic cannabinoids were provided by the sellers when purchases were made. Kamar said he purchased a rendition of smokeable synthetic cannabinoids called "Kratom" from several different companies located in San Diego, California, and Utah. Kamar said his sister, Sofie Downs, owns a tobacco shop named "Smokers Alley" located in Rosedale Highway, California.

42. Kamar stated that he sells smokeable synthetic cannabinoids online and currently has about 10,000 online customers. Kamar explained that when an online order is received, he ships the smokeable synthetic cannabinoids merchandise through the United Parcel Service (UPS). Kamar stated

that at the defendant warehouse he has one or two walk-in customers per day and they pay by cash, check, or credit card.  Kamar estimated that he had about "two point something" million dollars in his safe.  Kamar could not explain why he kept so much money in the safe.  Kamar could not give an answer as to his annual income, only that his bookkeeper takes care of his income and financial information.  Kamar then estimated that he believed he earned $200,000 a year.

43. The purported personal tax returns for Kamar and his wife obtained from Kamar's accountant for tax years 2001 through 2012 indicate that Kamar and his wife had taxable income totaling $642,776.00, significantly less than Kamar's estimate of his annual earnings and overall wealth.  This figure does not account for the defendant approximately $2,676,000.00 in U.S. Currency seized from Kamar's residence.

44. At the Bakersfield DEA Office, a Bakersfield Police Officer with his narcotic detecting canine Ranger conducted a "dog sniff" on the currency seized from the safe located in Kamar's residence.  Ranger gave a positive alert on the currency for the odor of narcotics.

**Execution of Federal Search Warrant at 1111 21st Street, Bakersfield, California**

45. Following the search of Kamar's residence, agents executed a federal search warrant at the defendant warehouse located at 1111 21st Street, Bakersfield, California.  During a search of the office area, agents located miscellaneous financial documents and computers.

46. During a search of the entry level of the defendant warehouse, agents located a large open area containing several storage shelves containing illegal synthetic cannabinoid products.  Specifically, agents seized approximately 406.3 grams of cannabinoids labeled "Purple Diesel"; approximately 420.2 grams of cannabinoids labeled "Bulldog"; approximately 352.2 grams of cannabinoids labeled "Mad Hatter"; approximately 636.8 grams of cannabinoids labeled "Lover's Blend"; approximately 624.5 grams of cannabinoids labeled "Froze Smoke"; approximately 626.7 grams of cannabinoids labeled "Demonilla"; approximately 662.3 grams of cannabinoids labeled "Yolo."  The cannabinoids were packaged in various sealed plastic wrappers and labeled for sale under their differing brand names.

47. During a search of the storage room area located in the southwest corner of the basement, agents located additional amounts of illegal synthetic cannabinoid products.  Specifically, approximately 3,377.1 grams of cannabinoids labeled "Mad Hatter"; approximately 4,987.2 grams of cannabinoids

labeled "Juicy Herbs"; approximately 695.4 grams of cannabinoids labeled "Bugsy Bunny"; approximately 559.2 grams of cannabinoids labeled "Knockout KO"; approximately 196.1 grams of cannabinoids labeled "Atomic"; approximately 226 grams of cannabinoids labeled "Adios Motherfucker"; approximately 1,225 grams of cannabinoids labeled "W.T.F."; approximately 731.8 grams of cannabinoids labeled "Royal Blend"; approximately 475.3 grams of cannabinoids labeled "Diablo 3"; approximately 632.6 grams of cannabinoids labeled "Scooby Doo X"; approximately 413.4 grams of cannabinoids labeled "Dopest Motherfucker"; approximately 388.2 grams of suspected cannabinoids labeled "Snoop Doggs Batch"; approximately 712.2 grams of suspected cannabinoids labeled "Mad Hatter"; approximately 506.8 grams of suspected cannabinoids labeled "Max Payne"; approximately 454.3 grams of suspected cannabinoids labeled "Maui Wowie"; approximately 1,000.5 grams of suspected cannabinoids labeled "Super Nova"; approximately 484.7 grams of suspected cannabinoids labeled "I-blown"; approximately 115 grams of suspected cannabinoids labeled "Miscellaneous brands"; approximately 505.3 grams of suspected cannabinoids labeled "Assassin's Creed 3"; approximately 941.8 grams of suspected cannabinoids labeled "Hello Kitty"; and, approximately 15.85 kilograms of suspected cannabinoids labeled "Scooby Snax." The cannabinoids were packaged in various sealed plastic containers and labeled for sale under their differing brand names.

### Execution of Federal Search Warrant at 3221 Niles Street, Bakersfield, CA

48. Following the search at the defendant warehouse, agents executed a federal search warrant at Kamar's business "Havana Smoke Shop" located at 3221 Niles Street, Bakersfield, California. During a search of the business, agents contacted the sole employee working in the business that day, who said that he normally works at the Stockdale Highway location and that he had been working for Kamar for about two months. Agents located 9 one-gram packages of "PEP" brand salvia displayed in a glass case on the west side of the business. Agents also located a safe underneath the cashier counter below the cash register. Agents contacted Kamar by telephone who provided the combination to the safe. Agents located inside the safe twenty white envelopes many of which contained United States currency. Agents observed that the envelopes had dates and dollar amount written on the envelopes. An official count of the currency located within the envelopes totaled the defendant approximately $5,857.00 in U.S. Currency.

49. On December 12, 2013, Mikhael Issa Kamar was indicted in the Eastern District of California for Conspiracy to Manufacture, Distribute, and Possess with the Intent to Distribute a Controlled Substance in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846, and Distribution of a Controlled Substance in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), <u>United States v. Mikhael Issa Kamar</u>, Case 1:13-CR-00429-DAD-BAM.

### FIRST CLAIM FOR RELIEF
### 21 U.S.C. § 881(a)(6)

50. Paragraphs one to forty-nine above are incorporated by reference as though fully set forth herein.

51. The defendant currency constitutes moneys furnished or intended to be furnished in exchange for a controlled substance or listed chemical, all proceeds traceable to such an exchange, and/or was used or intended to be used to commit or facilitate one or more violations of 21 U.S.C. §§ 841 *et seq.*

52. As a result of the foregoing, the defendant currency is subject to forfeiture to the United States in accordance with 21 U.S.C. § 881(a)(6).

### SECOND CLAIM FOR RELIEF
### 21 U.S.C. § 881(a)(7)

53. Paragraphs one to fifty-two above are incorporated by reference as though fully set forth herein.

54. The defendant warehouse was used or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of 21 U.S.C. §§ 841 *et seq.*, an offense punishable by more than one year's imprisonment.

55. As a result of the foregoing, the defendant warehouse is subject to forfeiture to the United States in accordance with 21 U.S.C. § 881(a)(7).

56. The United States does not request authority from the Court to seize the defendant warehouse at this time. The United States will, as provided by 18 U.S.C. §§ 985(b)(1) and 985(c)(1):

    a. post notice of this Complaint on the defendant warehouse;

    b. serve notice of this action on the defendant warehouse owners along with a copy of this Complaint; and

      c.    file a *lis pendens* notice in the county records of the defendant warehouse status as a defendant in this *in rem* forfeiture action.

57.    Title 18 U.S.C. § 985(c)(3) provides that, because the United States will post notice of this Complaint on the defendant warehouse, it is not necessary for the Court to issue an arrest warrant *in rem*, or to take any other action to establish *in rem* jurisdiction over the defendant warehouse. Title 18, United States Code, Section 985(b)(2) clearly states that "the filing of a *lis pendens* shall not be considered a seizure under this subsection."

## **PRAYER FOR RELIEF**

WHEREFORE, the United States prays that:

1.    Process issue according to the procedures of this Court in cases of actions *in rem;*

2.    Any person having an interest in said defendant assets be given notice to file a claim and to answer the complaint;

3.    The Court enter a judgment of forfeiture of the defendant assets to the United States; and,

4.    The Court grant such other relief as may be proper.

Dated:  October 17, 2018                     McGREGOR W. SCOTT
                                                  United States Attorney

By:   /s/ Kevin C. Khasigian
       KEVIN C. KHASIGIAN
       Assistant U.S. Attorney

**VERIFICATION**

I, Sasha Engle, hereby verify and declare under penalty of perjury that I am a Special Agent with the U.S. Drug Enforcement Administration, that I have read the foregoing Verified Complaint for Forfeiture *In Rem* and know the contents thereof, and that the matters contained in the Verified Complaint are true to the best of my knowledge and belief.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Special Agent with the Drug Enforcement Administration.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Dated:  October 11, 2018                    /s/ Sasha Engle
                                            SASHA ENGLE
                                            Special Agent
                                            Drug Enforcement Administration

                                            (Original signature retained by attorney)